**F I L E D**
CLERK, U.S. DISTRICT COURT

2/27/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>ROBERT AMIRYAN,<br>　aka "Rubo Fish,"<br>　aka "Rubo,"<br>　aka "Rub,"<br>　aka "Robo,"<br>　aka "Rob,"<br>　aka "Fish,"<br>　aka "Santoro,"<br>　aka "R,"<br>　aka "RR,"<br>VAHAN HARUTYUNYAN,<br>　aka "V,"<br>ARTUR HARUTYUNYAN,<br>　aka "Arthur,"<br>　aka "Bull,"<br>　aka "Tsul,"<br>IVAN BOJORQUEZ,<br>　aka "Stal,"<br>　aka "Steel," and<br>RENZO FRANCISCO EGUILUZ,<br>　aka "Temper,"<br>　aka "Temps,"<br>　aka "Tmp,"<br>　aka "John Doe,"<br>　aka "Tee Lnx,"<br><br>　　　　　Defendants. | 2:25-CR-433(A)-SPG<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1201(a)(1), (c): Conspiracy to Commit Kidnapping and Kidnapping; 18 U.S.C. § 1958(a): Conspiracy to Commit Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire and Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire; 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition; 18 U.S.C. §§ 981(a)(1)(C), 924(d)(1) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1201(c)]

[ALL DEFENDANTS]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

1.    Armenian Organized Crime in Los Angeles County

1.    Armenian Organized Crime, also referred to as the Armenian Mafia, originated in the former Union of Soviet Socialist Republics (the "USSR") and following the Cold War, existed under the control of the Russian Mafia (Russian: русская мафия, Romanized: *Russkaya Mafiya*), also known as ("aka") *Bratva* (Russian: Братва, English: brotherhood or band of brothers).

2.    Armenian Organized Crime comprised senior leaders, members, and associates who resided in modern-day Russia and Armenia, as well as other countries, including France, Spain, Iran, and the United States.  In the United States, most Armenian Organized Crime leaders, members, and associates resided in Los Angeles County, which contained one of the largest Armenian populations outside of Russia and Armenia.

3.    Armenian Organized Crime followed a "flat" or "flattened" organizational structure, in contrast to its traditional, strict, linear one where each member carried a specific title or rank and there was a clear, designated chain of command.  In Los Angeles County, this organizational restructuring led to the creation of decentralized, hybrid crime crews that included Armenian Organized Crime members as well as non-member and/or non-Armenian criminals.

4.    When residing outside of the former USSR and its surrounding territories, Armenian Organized Crime groups camouflaged themselves amongst expatriate and immigrant Armenian communities and used these communities as bases to establish Armenian criminal organizations internationally.  A hallmark of Armenian Organized Crime was the strategic use of violence to send a message, increase an individual's position within the Armenian criminal community, and/or leverage a business interest.  To avoid law enforcement detection, Armenian Organized Crime often assigned these acts of violence to non-Armenian criminal associates, such as members of *Sureño* (English: Southsider) street gangs under the control of the Mexican Mafia aka "*La Eme*" (English: The M), a prison-based criminal organization in Southern California primarily comprising Mexican-American gang members.

5.    Power and leadership in Armenian Organized Crime was based, among other things, on a combination of respect, seniority, that is, physical age, authority within the Russian Mafia, and relatedly, authority and influence within the Armenian criminal community.

6.    Traditionally, Armenian Organized Crime members and associates reported to a specific, high-level male crime boss who was born either in Armenia or a former Soviet country.  In Armenian Organized Crime, this crime boss was known as a "*orenk'ov gogh*" (Armenian: օրենքով գող, English: "thief in law") or "*gogh*" for short. Colloquially, *goghs* were also referred to as "*kerop*" (or "*qerop*"), which is Armenian slang for both "made man" and "wise guy."  A *gogh* could not be crowned, that is, named or appointed, without the blessing and/or approval of the Russian Mafia.

3

7. Under each *gogh*, there were multiple elders who each controlled their own organized crime group. The elders were the direct connection to the *gogh*, and they were responsible for meting out tasks or giving orders to the members and associates of their respective group. In essence, the elders were responsible for controlling the day-to-day and street-level criminal activity in their groups. Under each elder, there were assorted members and/or non-member associates with authority and influence within the Armenian criminal community.

8. More recently, Armenian Organized Crime leadership in Los Angeles County comprised individuals of influence called "*avtoritet*" (Russian: авторитет, English: person of significant authority) who generally controlled their own crime groups. Though revered in the Armenian criminal community, *avtoritet*, unlike *goghs*, were not crowned by the Russian Mafia. Nevertheless, *avtoritet* had reputations and were notorious in, among other places, the Armenian criminal underworld. Consequently, *avtoritet* wielded influence over members of Armenian criminal organizations, including Armenian Organized Crime; the Armenian Power (aka "AP," "AP-13," and "Armenian Power 13") criminal street gang, which received the number "13" as a sign of its solidarity with *La Eme*; and non-member Armenians who committed crimes.

9. In Los Angeles County, *avtoritet* typically operated independently from the Russian Mafia and other organized crime groups based in Eastern Europe. Instead, *avtoritet* cultivated a symbiotic relationship with the Mexican Mafia, which was fostered principally through the mutual incarceration of their members. Accordingly, Armenian Organized Crime groups and the *Sureño* street gangs that the

4

Mexican Mafia oversaw, including Armenian Power, often worked together to engage in criminal activities in the greater Los Angeles area, with Armenian criminal organizations often paying a percentage of their criminal profits ("taxes") to Mexican Mafia leaders, and the Mexican Mafia permitting *Sureño* gang members to act as enforcers or hired guns for Armenian Organized Crime.

### 2.    The Amiryan Organized Crime Group

10.    Defendants ROBERT AMIRYAN, aka "Rubo Fish," "Rubo," "Rub," "Robo," "Rob," "Fish," "Santoro," "R," and "RR," VAHAN HARUTYUNYAN, aka "V," ARTUR HARUTYUNYAN, aka "Arthur," "Bull," and "Tsul," IVAN BOJORQUEZ, aka "Stal," and "Steel," and RENZO FRANCISCO EGUILUZ, aka "Temper," "Temps," "Tmp," "John Doe," and "Tee Lnx," Sevak Gzraryan, aka "Seco," "Striker," and "Stryker," and Mikael Stepanian, aka "Mko," "Maik," "Mik," "Mike," "Miko," "Vlads," and "👀," and others known and unknown to the Grand Jury, were members and associates of a criminal organization (the "Amiryan Organized Crime Group") that engaged in, among other things, acts involving kidnapping and the use of interstate commerce facilities in the commission of murder-for-hire.

11.    The Amiryan Organized Crime Group was an Armenian Organized Crime group that operated in Los Angeles County and elsewhere with defendant AMIRYAN at the helm.  As an *avtoritet*, defendant AMIRYAN commanded respect and occupied a position of power within the Armenian criminal community in the greater Los Angeles area.  Typical of the flat Armenian Organized Crime structure, defendant AMIRYAN loosely commanded Armenian members of his organization, and he recruited and paid non-Armenian criminal associates, specifically,

5

members and associates of *Sureño* street gangs, such as Armenian Power 13 and Lennox 13, for the purpose of committing crimes at his behest.

3.    Other Members and Associates of the Amiryan Organized Crime Group

12.    Defendant V. HARUTYUNYAN, a self-reported citizen of the former USSR and person of Armenian descent, was a member and associate of the Amiryan Organized Crime Group and a resident of the Central District of California.

13.    Defendant A. HARUTYUNYAN, a citizen of Armenia, was a member and associate of the Amiryan Organized Crime Group and a resident of the Central District of California.

14.    Defendant BOJORQUEZ, a natural-born citizen of the United States, was a member of the Lennox 13 *Sureño* street gang, an associate of the Amiryan Organized Crime Group, and a resident of the Central District of California.

15.    Defendant EGUILUZ, a natural-born citizen of the United States, was a member of the Fuck A Bitch (aka "FAB") street gang/tagging crew, a member of the Lennox 13 *Sureño* street gang, an associate of the Amiryan Organized Crime Group, and a resident of the Central District of California.

16.    Gzraryan, a citizen of Armenia, was a member of the Armenian Power 13 street gang, a member and associate of the Amiryan Organized Crime Group, and a resident of the Central District of California.

17.    Stepanian, a citizen of Armenia, was a member and associate of the Amiryan Organized Crime Group and a resident of the Central District of California.

6

4. Shootings Targeting Defendants AMIRYAN and V. HARUTYUNYAN, Gzraryan and Stepanian, and Others

18. On or about October 25, 2022, Stepanian was shot as he stood in the driveway of his residence in Granada Hills, California. Stepanian survived.

19. On or about April 3, 2023, defendant AMIRYAN was shot at as he stood in the parking garage at his apartment complex in Burbank, California. Defendant AMIRYAN was uninjured.

20. On or about August 18, 2023, defendant V. HARUTYUNYAN's residence in North Hills, California, was shot at. Defendant V. HARUTYUNYAN was uninjured.

21. On or about August 25, 2023, defendant V. HARUTYUNYAN was shot as he stood in the backyard of his residence in North Hills. Defendants AMIRYAN and BOJORQUEZ, Gzraryan, and others known and unknown to the Grand Jury, were also present in the backyard at the time the shooting occurred. Defendant V. HARUTYUNYAN survived. Defendants AMIRYAN and BOJORUQEZ and Gzraryan were uninjured.

22. On or about March 14, 2025, defendant AMIRYAN's significant other was shot as she parked a vehicle at their apartment complex in Los Angeles. She survived. The couple's two minor children, who were also present in the motor vehicle, were uninjured.

23. On or about March 28, 2025, Gzraryan was shot as he sat in a car in front of his residence in Los Angeles. Gzraryan survived.

B.    OBJECT OF THE CONSPIRACY

24.    Beginning no later than on or about June 6, 2023, and continuing until on or about June 7, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants AMIRYAN, V. HARUTYUNYAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ, Grzraryan and Stepanian, and others known and unknown to the Grand Jury, conspired and agreed with each other to unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold Victim 1, for any reason, and, in committing and in furtherance of the commission of the offense, to use means, facilities, and instrumentalities of interstate and foreign commerce, namely, two-way radios, cellular phones, the Internet, and motor vehicles, in violation of Title 18, United States Code, Section 1201(a)(1).

C.    MANNER AND MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

25.    The object of the conspiracy was to be accomplished, in substance, as follows:

a.    Defendant V. HARUTYUNYAN, and others known and unknown to the Grand Jury, would surveil Victim 1.

b.    Defendant AMIRYAN, and others known and unknown to the Grand Jury, would recruit defendants BOJORQUEZ and EGUILUZ to partake in Victim 1's kidnapping, assault, and torture.

c.    To conceal the kidnappers' identities, members of the conspiracy would obtain a white Dodge Grand Caravan registered to an incarcerated individual (the "Dodge Minivan") to be used in committing and in furtherance of committing the kidnapping.

d.    To conceal the kidnappers' identities, and for the purpose of holding Victim 1 captive, defendant V. HARUTYUNYAN, and

8

others known and unknown to the Grand Jury, would secure an unoccupied residence in Sun Valley, California (the "Sun Valley Residence").

e.   Defendant A. HARUTYUNYAN, and others known and unknown to the Grand Jury, would call Victim 1 to lure him from his home in North Hollywood, California, so that Victim 1 could be kidnapped.

f.   Members of the conspiracy would use physical force and violence, including by striking Victim 1, to kidnap him.

g.   Members of the conspiracy would use the Dodge Minivan to kidnap and transport Victim 1 to the Sun Valley Residence, while others would separately travel to Sun Valley Residence, also using motor vehicles.

h.   Defendant AMIRYAN, and others known and unknown to the Grand Jury, would watch and detain Victim 1 at the Sun Valley Residence.

i.   While at the Sun Valley Residence, members of the conspiracy would possess firearms and ammunition, strike Victim 1, and utilize interrogational torture techniques to obtain the names of those allegedly responsible for the shootings targeting defendant AMIRYAN and Stepanian.

j.   Members of the conspiracy would use Gzraryan's cellular phone to video-record Victim 1's assault and torture at the Sun Valley Residence.

k.   Defendants AMIRYAN, V. HARUTYUNYAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ, Gzraryan and Stepanian, and others known and unknown to the Grand Jury, would use two-way radios, cellular phones, and Telegram, a cloud-based encrypted messaging application, to communicate regarding the kidnapping.

9

D.    OVERT ACTS

26.    In furtherance of the conspiracy, and to accomplish its objects, defendants AMIRYAN, V. HARUTYUNYAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ, Gzraryan and Stepanian, and others known and unknown to the Grand Jury, on or about the dates set forth below, committed and caused to be committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:    On June 5, 2023, via Telegram and using coded language, defendant BOJORQUEZ asked defendant AMIRYAN if he required the assistance of defendants BOJORQUEZ and EGUILUZ that evening.

Overt Act No. 2:    On June 6, 2023, defendant V. HARUTYUNYAN traveled to Victim 1's residence.

Overt Act No. 3:    On June 6, 2023, via Telegram and using coded language, defendant BOJORQUEZ informed defendant AMIRYAN that he and defendant EGUILUZ were heading to Los Angeles for the purpose of doing defendant AMIRYAN's bidding.

Overt Act No. 4:    On June 6, 2023, via Telegram and using coded language, defendant AMIRYAN informed defendant BOJORQUEZ that he would see him shortly in Los Angeles.

Overt Act No. 5:    On June 6, 2023, via Telegram and using coded language, defendant AMIRYAN instructed defendant BOJORQUEZ that he and defendant EGUILUZ should arrive at the Sun Valley Residence between 7:30 and 8:00 p.m.

Overt Act No. 6:    On June 6, 2023, via Telegram and using coded language, defendant BOJORQUEZ confirmed that he would see defendant AMIRYAN shortly.

10

Overt Act No. 7:   On June 6, 2023, via Telegram and using coded language, defendant BOJORQUEZ alerted defendant AMIRYAN that defendant EGUILUZ had arrived at the Sun Valley Residence.

Overt Act No. 8:   On June 6, 2023, via Telegram and using coded language, defendant BOJORQUEZ alerted defendant AMIRYAN that he had also arrived at the Sun Valley Residence.

Overt Act No. 9:   On June 6, 2023, via Telegram and using coded language, defendant AMIRYAN asked defendant BOJORQUEZ for confirmation that he and defendant EGUILUZ were at the Sun Valley Residence and informed them he was attempting to lure Victim 1 from his residence.

Overt Act No. 10:   On June 6, 2023, via Telegram and using coded language, defendant BOJORQUEZ informed defendant AMIRYAN that he was at the Sun Valley Residence with defendant EGUILUZ.

Overt Act No. 11:   At various times during June 6 and June 7, 2023, defendants AMIRYAN, V. HARUTYUNYAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ, Gzraryan and Stepanian, and others known and unknown to the Grand Jury, convened at the Sun Valley Residence.

Overt Act No. 12:   On June 6, 2023, defendant A. HARUTYUNYAN repeatedly called Victim 1's phone number to lure Victim 1 from his residence so that he could be kidnapped.

Overt Act No. 13:   Between June 6 and June 7, 2023, after defendant A. HARUTYUNYAN had spoken with Victim 1 on the phone and caused him to leave his residence, members of the conspiracy assaulted Victim 1 and kidnapped Victim 1 by forcing him into the Dodge Minivan and transporting him to the Sun Valley Residence.

Overt Act No. 14:   On June 7, 2023, members of the conspiracy arrived at the Sun Valley Residence with Victim 1 inside the Dodge

Minivan and pulled into the garage to conceal Victim 1's removal from the vehicle.

Overt Act No. 15:   On June 7, 2023, while at the Sun Valley Residence, members of the conspiracy assaulted and tortured Victim 1 to gain information from Victim 1 pertaining to the shooting of defendant AMIRYAN and Stepanian and recorded it on Gzraryan's cellular phone.

Overt Act No. 16:   On June 7, 2023, members of the conspiracy cleaned the interior of the Dodge Minivan to attempt to remove forensic evidence.

Overt Act No. 17:   On June 7, 2023, after law enforcement had arrived, Stepanian and other members of the conspiracy fled from the Sun Valley Residence, while defendants AMIRYAN and V. HARUTYUNYAN and Gzraryan stayed behind.

Overt Act No. 18:   On June 7, 2023, as Stepanian was fleeing from the Sun Valley Residence to avoid law enforcement detection, he discarded a loaded Smith & Wesson, model 638 Airweight, .38 S&W Special +P caliber revolver, bearing serial number DAM3868, near the Sun Valley Residence.

Overt Act No. 19:   On June 7, 2023, as they were fleeing from the Sun Valley Residence to avoid law enforcement detection, members of the conspiracy discarded and attempted to conceal on properties adjacent to the Sun Valley Residence, among other items, nitrile gloves; balaclava masks; two loaded AR-15-type semi-automatic rifles bearing no legitimate manufacturer's mark or serial number (commonly referred to as "ghost guns"); one Para Ordnance, model 1911 Expert Commander, .45 auto caliber semi-automatic pistol, bearing serial number K029104, with a silencer attached; one Sig Sauer, model MCX,

5.56 NATO x 7.62 NATO caliber semi-automatic rifle, bearing serial number 63F039344; one Walter, model P22, .22 caliber semi-automatic pistol, with an obliterated serial number and a silencer attached; assorted ammunition and extended ammunition magazines; a Global Positioning System ("GPS") tracking device; a two way radio; and blood-stained items.

Overt Act No. 20:  On June 7, 2023, members of the conspiracy threw a loaded Smith & Wesson, model 442-1 Airweight, .38 Special caliber revolver, bearing serial number CYM6399; a loaded Smith & Wesson, model 642-1 Airweight, .38 Special caliber revolver, bearing serial number DNR9780; and car keys belonging to Victim 1 into a pool in the backyard of the Sun Valley Residence in an attempt to conceal these items from law enforcement.

Overt Act No. 21:  On June 8, 2023, defendant A. HARUTYUNYAN hid himself under a covering in the backseat of a black Range Rover and attempted to surreptitiously leave the United States and enter Mexico through the San Ysidro Port of Entry.

Overt Act No. 22:  On June 8, 2023, defendant A. HARUTYUNYAN successfully entered Mexico through the San Ysidro Port of Entry.

Overt Act No. 23:  On or after June 8, 2023, defendant A. HARUTYUNYAN left Mexico and traveled to Armenia, which does not extradite its own citizens.

COUNT TWO

[18 U.S.C. §§ 1201(a)(1), 2]

[ALL DEFENDANTS]

27.   The Grand Jury realleges paragraphs 1 through 23 of this First Superseding Indictment here.

28.   Between on or about June 6, 2023, and on or about June 7, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants AMIRYAN, V. HARUTYUNYAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ, Gzraryan and Stepanian, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away and held Victim 1, and willfully caused Victim 1 to be seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away and held, for any reason, using means, facilities, and instrumentalities of interstate and foreign commerce, namely, two-way radios, cellular telephones, the Internet, and motor vehicles, in committing and in furtherance of the commission of the offense.

14

COUNT THREE

[18 U.S.C. § 1958(a)]

[DEFENDANTS AMIRYAN AND EGUILUZ]

29. The Grand Jury realleges paragraphs 1 through 23 of this First Superseding Indictment here.

A.    OBJECT OF THE CONSPIRACY

30. Beginning no later than on or about June 6, 2023, and continuing until on or about May 20, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants AMIRYAN and EGUILUZ, Stepanian, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly use facilities of interstate and foreign commerce, namely, two-way radios, motor vehicles, cellular telephones, and the Internet, with the intent that the murders of Victim 2 and Victim 3 be committed in violation of the laws of the State of California, as consideration for the receipt of, and consideration for a promise and agreement to pay, anything of pecuniary value, in violation of Title 18, United States Code, Section 1958(a).

B.    MANNER AND MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

31. The objects of the conspiracy were to be accomplished, in substance, as follows:

    a.    Following shootings targeting defendant AMIRYAN and Stepanian, members of the conspiracy would kidnap Victim 1 and assault and torture him to obtain the name(s) of those responsible for the shootings.

    b.    From Victim 1's kidnapping, assault, and torture, members of the conspiracy would confirm that Victims 2 and 3 were

15

adversaries of defendant AMIRYAN and the Amiryan Organized Crime Group and call for their murders.

c.   Defendant AMIRYAN would recruit defendant EGUILUZ, Stepanian, and others known and unknown to the Grand Jury, to partake in the conspiracy to murder Victims 2 and 3.

d.   Defendant AMIRYAN and Stepanian would recruit additional *Sureño* gang members for the purpose of stalking and murdering Victims 2 and 3.

e.   Defendant AMIRYAN and Stepanian would obtain bulletproof vests for themselves and other members of the conspiracy.

f.   Stepanian would direct members of the conspiracy to fly drones over Victims 2 and 3's residences for the purpose of stalking them.

g.   Defendant AMIRYAN would direct members of the conspiracy to place GPS trackers on vehicles belonging to Victim 3 and associates of Victims 2 and 3 for the purpose of stalking Victims 2 and 3.

h.   Defendant AMIRYAN and Stepanian would obtain floor plans as well as photographs of the interior of Victims 2 and 3's residences using open-source databases and drones and then provide these images of members of the conspiracy tasked with murdering Victims 2 and 3.

i.   Defendant EGUILUZ, and others known and unknown to the Grand Jury, would stalk Victims 2 and 3 and conduct reconnaissance at Victims 2 and 3's residences.

j.   Defendant AMIRYAN would offer to pay defendant EGUILUZ, and others known and unknown to the Grand Jury, for their respective roles in the murder conspiracy.

16

C.    OVERT ACTS

32.    In furtherance of the conspiracy, and to accomplish its objects, defendants AMIRYAN and EGUILUZ, Stepanian, and others known and unknown to the Grand Jury, on or about the dates set forth below, committed and caused to be committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:    Between December 25, 2024, and March 20, 2025, defendant AMIRYAN saved aerial drone footage of Victim 2's residence in Northridge, California on his cellular phone.

Overt Act No. 2:    On December 30, 2024, defendant AMIRYAN saved photographs depicting Victims 2 and 3 on his cellular phone.

Overt Act No. 3:    On January 1, 2025, via the encrypted messaging application Signal, Stepanian sent a co-conspirator approximately three addresses associated with Victim 2 and advised the co-conspirator that he also sent the co-conspirator a video of Victim 2's new house in a gated community.

Overt Act No. 4:    On January 1, 2025, via Signal, Stepanian sent a co-conspirator the longitudinal and latitudinal coordinates for Victim 2's residence.

Overt Act No. 5:    On January 1, 2025, via Signal, Stepanian sent a co-conspirator photographs of vehicles registered to relatives of Victim 2's close criminal associate.

Overt Act No. 6:    On January 5, 2025, defendant AMIRYAN saved an aerial photograph of Victim 2's residence and neighborhood with Victim 2's residence circled on his cellular phone.

Overt Act No. 7:    On February 11, 2025, defendant EGUILUZ, and others known and unknown to the Grand Jury, traveled to Victim 2's gated community and attempted to get past the gate.

17

Overt Act No. 8:   On February 19, 2025, via WhatsApp and using coded language, defendant AMIRYAN informed defendant EGUILUZ that he was going to pay him for his role in the murder plot.

Overt Act No. 9:   On February 19, 2025, via WhatsApp and using coded language, defendant EGUILUZ advised defendant AMIRYAN that he had taken three trips to Victim 2's residence and attempted to get past the gate.

Overt Act No. 10:   On February 22, 2025, via WhatsApp and using coded language, defendant AMIRYAN advised defendant EGUILUZ that he had obtained approximately five bulletproof vests.

Overt Act No. 11:   On February 22, 2025, via WhatsApp and using coded language, defendant AMIRYAN reiterated to defendant EGUILUZ that he was going to pay him for his role in the murder plot.

Overt Act No. 12:   On March 5, 2025, defendant EGUILUZ, and others known and unknown to the Grand Jury, broke into a vehicle and attempted to locate a remote control to open the gate for Victim 2's gated community.

Overt Act No. 13:   On March 13, 2025, defendant EGUILUZ, and others known and unknown to the Grand Jury, broke into a vehicle and attempted to locate a remote control to open the gate for Victim 2's gated community.

Overt Act No. 14:   On March 17, 2025, defendant AMIRYAN ran Internet searches for Victim 2, Victim 2's family members, and Victim 2's residence on his cellular phone.

Overt Act No. 15:   On March 20, 2025, defendant AMIRYAN ran Zillow searches for Victim 2's residence and residences in Victim 2's neighborhood.

Overt Act No. 16:  On March 20, 2025, defendant AMIRYAN saved aerial photographs of Victim 2's residence and neighborhood on his cellular phone.

Overt Act No. 17:  On March 22, 2025, defendant AMIRYAN saved a photograph of a close criminal associate of Victims 2 and 3 on his cellular phone.

Overt Act No. 18:  On April 2, 2025, via Signal, Stepanian sent defendant AMIRYAN the home addresses for Victims 2 and 3 and a close criminal associate of Victims 2 and 3.

Overt Act No. 19:  On April 4, 2025, via Signal and using coded language, Stepanian advised defendant AMIRYAN that due to the wind, co-conspirators had been unable to fly a drone over Victim 2's residence.

Overt Act No. 20:  On April 4, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that Victim 3 was currently at his residence in Tujunga, California.

Overt Act No. 21:  On April 6, 2025, via Signal, Stepanian sent defendant AMIRYAN a photograph of a close criminal associate of Victims 2 and 3.

Overt Act No. 22:  On April 6, 2025, via Signal and using coded language, Stepanian advised defendant AMIRYAN that a co-conspirator was on his way to Victim 2's residence.

Overt Act No. 23:  On April 6, 2025, via Signal and using coded language, defendant AMIRYAN requested that Stepanian run a Zillow search to determine where the master bedroom in Victim 2's residence was located, and Stepanian replied that he would.

Overt Act No. 24:   On April 6, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that a light was on and a vehicle was present at Victim 2's residence.

Overt Act No. 25:   On April 6, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that he believed Victim 2 was using a drone blocker because the drone they deployed would lose its signal anytime it approached Victim 2's residence.

Overt Act No. 26:   On April 7, 2025, via Signal and using coded language, defendant AMIRYAN told Stepanian that co-conspirators required additional time to prepare for Victims 2 and Victim 3's murder.

Overt Act No. 27:   On April 8, 2025, defendant AMIRYAN ran an Internet search for Victim 3.

Overt Act No. 28:   On April 8, 2025, via Signal and using coded language, Stepanian inquired if a co-conspirator knew how to make Molotov cocktails.

Overt Act No. 29:   On April 8, 2025, via Signal and using coded language, Stepanian advised a co-conspirator to obtain the necessary supplies so that the co-conspirator would be prepared to firebomb a location when called upon.

Overt Act No. 30:   On April 8, 2025, via Signal and using coded language, Stepanian asked defendant AMIRYAN if he should bring bulletproof vests.

Overt Act No. 31:   On April 8, 2025, via Signal and using coded language, defendant AMIRYAN asked Stepanian to provide Victim 3's home address, and Stepanian sent it.

Overt Act No. 32:   On April 8, 2025, via Signal, defendant AMIRYAN sent a co-conspirator to Victim 3's residence in Tujunga.

20

Overt Act No. 33:   On April 8, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that a member of the conspiracy was skilled in making Molotov cocktails.

Overt Act No. 34:   On or before April 16, 2025, defendant AMIRYAN and Stepanian, and others known and unknown to the Grand Jury, placed a GPS tracker on Victim 3's motor vehicle.

Overt Act No. 35:   On April 16, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that members of the conspiracy would murder Victims 2 and 3 within the next couple of days.

Overt Act No. 36:   On April 18, 2025, via WhatsApp and using coded language, defendant AMIRYAN told defendant EGUILUZ that he wanted Victims 2 and 3 murdered so that his everyday life would return to normal.

Overt Act No. 37:   On April 19, 2025, defendant AMIRYAN saved a screenshot of a "Search People Free" page for Victim 2's brother on his cellular phone.

Overt Act No. 38:   On April 19, 2025, defendant AMIRYAN ran a Zillow search for Victim 2's residence on his cellular phone.

Overt Act No. 39:   On April 19, 2025, defendant AMIRYAN ran "Search People Free" searches on Victims 2 and 3 and their relatives.

Overt Act No. 40:   On April 19, 2025, via Signal, defendant AMIRYAN sent Stepanian Zillow information for Victim 2's residence.

Overt Act No. 41:   On April 27, 2025, via Signal and using coded language, Stepanian inquired if there was any progress in murdering Victims 2 and 3, and defendant AMIRYAN responded, also using coded language, that he and other members of the conspiracy were contemplating a change in strategy.

Overt Act No. 42:   On April 29, 2025, via Signal and using coded language, defendant AMIRYAN asked Stepanian to send a co-conspirator to Victim 3's residence to conduct reconnaissance.

Overt Act No. 43:   On April 29, 2025, via Signal and using coded language, defendant AMIRYAN informed Stepanian that he wanted to complete the murders.

Overt Act No. 44:   Starting on or before April 30, 2025, and continuing until May 19, 2025, defendant EGUILUZ hired individuals to facilitate the murder of Victims 2 and 3 at defendant AMIRYAN's request.

Overt Act No. 45:   On May 1, 2025, via WhatsApp and using coded language, defendant AMIRYAN agreed to pay defendant EGUILUZ for his role in the murder conspiracy.

Overt Act No. 46:   On May 1, 2025, via Signal and using coded language, defendant AMIRYAN asked if Stepanian would be able to figure out where Victim 3 slept.

Overt Act No. 47:   On May 1, 2025, via Signal and using coded language, Stepanian stated that he was in the process of obtaining blueprints for Victim 3's residence.

Overt Act No. 48:   On May 1, 2025, Stepanian ordered a co-conspirator to conduct reconnaissance at Victim 3's residence.

Overt Act No. 49:   On May 2, 2025, via Signal and using coded language, Stepanian advised defendant AMIRYAN that Victim 3 was home.

Overt Act No. 50:   On May 2, 2025, via Signal and using coded language, Stepanian stated that he found photographs of Victim 3's residence and was able to locate Victim 3's master bedroom.

Overt Act No. 51:   On May 6, 2025, defendant EGUILUZ ran at least two searches on realtor.com for Victim 3's address on his cellular phone.

Overt Act No. 52:   On May 7, 2025, defendant AMIRYAN, via Signal and using coded language, told Stepanian that he was going to pick up defendant EGUILUZ and Gzraryan.

Overt Act No. 53:   On May 7, 2025, via Signal, Stepanian sent defendant AMIRYAN a realtor.com webpage of Victim 3's residence.

Overt Act No. 54:   On May 7, 2025, via Signal and using coded language, Stepanian provided defendant AMIRYAN with location updates of a criminal associate of Victims 2 and 3.

Overt Act No. 55:   On May 17, 2025, defendant EGUILUZ ran an Internet search for Victim 3's residential address.

Overt Act No. 56:   On May 17, 2025, via WhatsApp and using coded language, defendant EGUILUZ informed defendant AMIRYAN that he and other members of the conspiracy were prepared to murder Victim 3.

Overt Act No. 57:   On May 18, 2025, via WhatsApp and using coded language, defendant EGUILUZ asked defendant AMIRYAN if he and other members of the conspiracy could move forward with the murder of Victim 3.

Overt Act No. 58:   On May 18, 2025, via WhatsApp and using coded language, defendant AMIRYAN told defendant EGUILUZ that he would send a drone to see if Victim 3 was at his residence.

Overt Act No. 59:   On May 18, 2025, via WhatsApp and using coded language, defendant EGUILUZ asked defendant AMIRYAN to provide additional information about the interior of Victim 3's residence, which defendant AMIRYAN provided.

Overt Act No. 60:   On May 18, 2025, via WhatsApp and using coded language, defendant EGUILUZ reiterated to defendant AMIRYAN that he and other members of the conspiracy were prepared to murder Victim 3.

Overt Act No. 61:   On May 18, 2025, via WhatsApp and using coded language, defendant AMIRYAN provided defendant EGUILUZ with drone footage of Victim 3's residence.

Overt Act No. 62:   On May 18, 2025, via Signal and using coded language, Stepanian informed defendant AMIRYAN that Victim 3 was not at his residence and that his residence appeared to have been empty for the past three days.

Overt Act No. 63:   On May 18, 2025, via WhatsApp and using coded language, defendant AMIRYAN informed defendant EGUILUZ that Victim 3 was not at his residence.

Overt Act No. 64:   On May 18, 2025, via WhatsApp and using coded language, defendant AMIRYAN informed defendant EGUILUZ that he and other members of the conspiracy would murder Victim 3 at a later date.

Overt Act No. 65:   On or before May 20, 2025, defendant EGUILUZ saved a realtor.com screenshot of the interior and exterior of Victim 3's residence.

Overt Act No. 66:   On or before May 20, 2025, defendant EGUILUZ saved a photograph of the "Notes" section of an iPhone that included, among other information, Victim 3's residential address.

Overt Act No. 67:   On or before May 20, 2025, Stepanian saved a screenshot of a FaceTime call that included Victim 2 on his cellular phone.

Overt Act No. 68:   On or before May 20, 2025, Stepanian saved a screenshot of drone footage depicting Victim 2's residence on his cellular phone.

Overt Act No. 69:   On or before May 20, 2025, Stepanian saved screenshots of approximately five addresses associated with Victim 2.

COUNT FOUR

[18 U.S.C. §§ 1958(a), 2]

[DEFENDANTS AMIRYAN AND EGUILUZ]

33.  The Grand Jury realleges Paragraphs 1 through 23 of this First Superseding Indictment here.

34.  Beginning no later than on or about June 6, 2023, and continuing until on or about May 20, 2025, in Los Angeles County, within the Central District of California, defendants AMIRYAN and EGUILUZ, Stepanian, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly used facilities of interstate and foreign commerce, and caused others to use facilities of interstate and foreign commerce, specifically, motor vehicles, cellular phones, and the Internet with intent that the murder of Victim 2 be committed in violation of the laws of the State of California as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value.

Case 2:25-cr-00433-SPG   Document 266   Filed 02/27/26   Page 27 of 36   Page ID #:2315

COUNT FIVE

[18 U.S.C. §§ 1958(a), 2]

[DEFENDANTS AMIRYAN AND EGUILUZ]

35.  The Grand Jury realleges Paragraphs 1 through 23 of this First Superseding Indictment here.

36.  Beginning no later than on or about June 6, 2023, and continuing until on or about May 20, 2025, in Los Angeles County, within the Central District of California, defendants AMIRYAN and EGUILUZ, Stepanian, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly used facilities of interstate and foreign commerce, and caused others to use facilities of interstate and foreign commerce, specifically, motor vehicles, cellular phones, and the Internet with intent that the murder of Victim 3 be committed in violation of the laws of the State of California as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value.

27

COUNT SIX

[18 U.S.C. § 922(g)(1)]

[DEFENDANT AMIRYAN]

37.  The Grand Jury realleges Paragraphs 1 through 23 of this First Superseding Indictment here.

38.  Beginning on a date unknown and continuing until on or about May 20, 2025, defendant AMIRYAN knowingly possessed firearms and ammunition, each in and affecting interstate and foreign commerce, including, but not limited to, the following:

**Firearms**

| Make | Model | Caliber | Type | Serial No. |
|---|---|---|---|---|
| Smith & Wesson | 642 | .38 S&W SPL +P | Pistol | DEE0731 |
| FNH USA | FNX-45 | .45 ACP | Pistol | FX3U139209 |
| Glock GMBH | 22 GEN5 | .40 S&W | Pistol | BTKA916 |
| Glock GMBH | 40 GEN4 | 10 mm | Pistol | BCTH007 |

**Ammunition**

| No. of Rounds | Make | Caliber |
|---|---|---|
| 5 | Federal Premium Ammunition | .45 Auto |
| 1 | Hornady | .45 Auto +P |
| 1 | Poongsan Corporation | .223 |
| 1 | Winchester/Olin Corporation | .40 S&W |
| 1 | Hornady | 9mm Luger +P |
| 2 | Sellier & Bellot | 10 mm Auto |
| 1 | Fiocchi | 10 mm Auto |

28

| 1 | Arms Corporation (Armscor) | 300 AAC Blackout |
|---|---|---|
| 1 | Winchester/Olin Corporation | .223 |
| 2 | Winchester/Olin Corporation | .38 SPL +P |
| 1 | Federal Premium Ammunition | .38 SPL +P |

39.  Defendant AMIRYAN possessed such firearms and ammunition knowing that he had previously been convicted of the following felony crime, punishable by a term of imprisonment exceeding one year:

a.   Engaging in the business of dealing firearms without a federal license, in violation of Title 18, United States Code, Section 922(a), in United States District Court, Central District of California, Case Number 2:00-cr-01286-CBM, on or about August 13, 2001.

29

COUNT SEVEN

[18 U.S.C. § 922(g)(1)]

[DEFENDANT EGUILUZ]

40.  The Grand Jury realleges Paragraphs 1 through 23 of this First Superseding Indictment here.

41.  Beginning on a date unknown and continuing until on or about May 20, 2025, defendant EGUILUZ knowingly possessed a firearm and ammunition, namely, a Hawk Industries, Pardner Pump, 12-gauge shotgun, bearing serial number NZ830416; and approximately five rounds of Winchester/Olin Corporation 12-gauge ammunition, each in and affecting interstate and foreign commerce.

42.  Defendant EGUILUZ possessed such firearm and ammunition knowing that he had previously been convicted of the following felony crime, punishable by a term of imprisonment exceeding one year:

a.  Assault of a person with a semi-automatic firearm, in violation of California Penal Code Section 245(b), in the Superior Court of State of California, County of Los Angeles, Case Number SA058161, on or about April 23, 2007.

30

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

[ALL DEFENDANTS]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in either of Counts One or Two of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

31

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 981(a)(1)(C), 924(d)(1) and 28 U.S.C. § 2461(c)]

[DEFENDANTS AMIRYAN AND EGUILUZ]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Three through Five of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses;

(b)  All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(c)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been

33

transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

[DEFENDANTS AMIRYAN AND EGUILUZ]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in either of Counts Six or Seven of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

        (a)  All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

        (b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

///

///

35

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

J. MARK CHILDS
Assistant United States Attorney
Chief, Transnational Organized
Crime Section

LYNDSI ALLSOP
Assistant United States Attorney
Deputy Chief, Transnational
Organized Crime Section

MATTHEW J. TAKO
Assistant United States Attorney
Transnational Organized Crime
Section

ERIC L. MACKIE
Assistant United States Attorney
General Crimes Section